James P. Flynn, Esquire
Daniel Levy, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)
jflynn@ebglaw.com
dlevy@ebglaw.com
Counsel for Commvault Systems, Inc.

Russell Beck, Esquire
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
(617) 500-8660 (phone)
(617) 500-8665 (fax)
Co-Counsel for Commvault Systems, Inc. (*Pro Hac Vice* Pending)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| COMMVAULT SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BRAD SCHWARZ,<br><br>Defendant. | Civil Action No. |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>

Plaintiff Commvault Systems, Inc. ("Commvault"), by and through its undersigned

counsel, hereby brings the following Complaint for Injunctive and Other Relief against

Defendant Brad Schwarz ("Schwarz").

## NATURE OF THE CASE

Until last Wednesday, January 19, 2022, when he resigned (for a second time), Schwarz was responsible for leading sales efforts in the Americas for one of Commvault's specialized platforms, Metallic™. During the next two days, Thursday and Friday, January 20th and 21st, Commvault learned that, on his way out the door, Schwarz secretly stole a treasure trove of Commvault's most up-to-the-minute, competitively-sensitive, confidential and proprietary information to use on behalf of Commvault's direct competitor, Cohesity, Inc. ("Cohesity" or "Direct Competitor"), in his new, virtually-identical job that Schwartz begins today, Monday, January 24, 2022.

Under cover of a contrived offer and acceptance process, Schwarz unlawfully took the collective work of over 400 Commvault employees throughout sales, marketing, pre-sales, operations, customer success, and partner teams, and the Americas business unit. This collective work is nearly two years in the making with extensive learning, wins, losses, and resulting analysis along the way that shaped what Commvault is today, as well as the blueprint for success going forward.

There is no lawful reason for Schwarz to have accessed and downloaded almost two dozen confidential and propriety documents in the afternoon and evening of the day before his 4:20 AM resignation – putting aside the dozens of other documents he emailed to himself, accessed, and/or downloaded with no legitimate business reason in the weeks leading up to his resignation – other than to use that information to supplement the other trade secret and confidential information that he learned from his role with Commvault and to now use that information to assist Commvault's Direct Competitor in unfair competition. He must be stopped immediately.

Given the extent of his exposure to and knowledge of this information at Commvault, the fact that his new employer is a direct competitor, and that he (repeatedly) misappropriated significant amounts of Commvault's trade secrets and other confidential information, Schwarz's work for Commvault's Direct Competitor constitutes an immediate and urgent threat to Commvault.

## PARTIES

1.     Commvault Systems, Inc., is a Delaware corporation, headquartered in Tinton Falls, New Jersey.

2.     Brad Schwarz is an individual residing at 107 Loring Ave Mill Valley, California 94941.

## JURISDICTION AND VENUE

3.     Subject matter jurisdiction exists pursuant to 18 U.S.C. § 1836(c), which provides the Court with original jurisdiction over claims involving the misappropriation of trade secrets used in, or intended for use in, interstate or foreign commerce, such as those here.  Thus, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.  In addition, this Court has subject matter jurisdiction under 28 U.S.C § 1332 in that there is complete diversity of citizenship between the Plaintiff and the Defendant and the amount in controversy exceeds $75,000, exclusive of interest.

4.     The Court has personal jurisdiction over Schwarz.  Along with Schwarz's substantial and continuing contacts with New Jersey as alleged above and herein, Commvault is informed and believes that Schwarz's actions causing Commvault's injury, even if initiated at times outside of New Jersey, were expressly aimed at New Jersey, with knowledge that they

would cause harm in New Jersey.  These purposeful actions constitute at least minimum contact with New Jersey such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice.  This Court's personal jurisdiction over Schwarz is further established by virtue of his express consent to the federal courts of New Jersey serving as the exclusive forum for disputes, as set forth in his respective written agreements, described *infra*.

5.  Venue is proper as Commvault's principal place of business is in New Jersey, and the parties have an express agreement between them selecting the courts of New Jersey as the exclusive forum for disputes, and have selected the law of New Jersey as the applicable law. Venue is proper within this district based on 28 U.S.C. § 1391 in that the parties have contractually agreed to venue (and choice of law) in the jurisdiction of the Courts of the State of New Jersey.  *Atlantic Marine Construction Company v. United States District Court for Western District of Texas*, 134 S. Ct. 568, 581 (2013).

6.  Venue is also proper because a substantial part of the events took place in New Jersey in that Schwarz directed communications to New Jersey in connection with his on-boarding, throughout his employment, and in connection with his departure.  Additionally, Commvault directed a majority of business activities from New Jersey (including Schwarz's work, which itself included sales activities directed from headquarters in New Jersey, and at New Jersey customers and other customers).

## FACTUAL BACKGROUND

### THE DATA PROTECTION AND DATA MANAGEMENT INDUSTRY

7.  Commvault is an industry leader in data protection, data storage, and data management.  Commvault provides data security and management services, including data

backup and recovery, disaster recovery, file storage optimization, data governance, and compliance management tools across on-premises, cloud, and Software-as-a-Service ("SaaS") environments.  Commvault's SaaS solutions provide customers with agile and robust data security, with the convenience of cloud-based support.

8.    Metallic™ ("Metallic"), a division of Commvault, was established to bring next-generation SaaS-delivered data protection to market, delivering Commvault's powerful core technology simply and quickly through the cloud. Part of Commvault's Intelligent Data Services Platform, Metallic, provides among other things, Data Management-as-a Service ("DMaaS"). (DMaaS is a term describing a variety of data management, backup, disaster recovery and other services provided together through a SaaS offering.)  Metallic is a fast, flexible, trusted SaaS data protection portfolio built in partnership with Microsoft Azure, with enterprise scalability that can be up and running in 15 minutes.

9.    Vendors in the data protection and management industry provide three different deployment models: on-premise (meaning data is backed up locally), SaaS (in which data is backed up in the cloud), and a hybrid of on-premise/SaaS (typically meaning that data is backed up both locally and in the cloud).

10.    One trend in the industry is for companies to transition their data management and protection services to cloud-based solutions, such as Commvault's Metallic platform.  This trend is driven by the convenience, increased security, and cost efficiencies associated with a SaaS model, for both customers and vendors.

11.    Commvault competes directly with Cohesity, as both seek to provide a selection of data protection and recovery services to endpoint customers, including, in particular large, national and international ("enterprise") companies.  Indeed, Commvault even dedicates an

entire page of its website encouraging customers to "[b]reak away from limitations and switch from Cohesity to Commvault."[1]  These companies also compete in other ways, including for employees, contractors, and vendors.

12.     Commvault's Direct Competitor has a DMaaS offering that, to date, Commvault believes has failed to achieve Metallic's industry recognition and market success.

13.     The ability to effectively operate and grow a DMaaS business is a critical competitive advantage that Commvault has in this industry, which many competitors try to replicate.  Commvault's Direct Competitor touts its DMaaS as the modern approach to data management:  "The challenge with today's data-centric workloads, the lifeblood of nearly every organization, is that there's too much data, in too many places, with too much cost, complexity, and risk. When you combine this with a lack of visibility, compliance, utilization, and the management overhead associated with all of it, this combination can really hold back business from its desired gains.  This is precisely the conundrum that Data Management as a Service (DMaaS) solves."  *See* https://www.cohesity.com/blogs/data-management-as-a-service-dmaas-for-modern-multicloud-it-environments/ (last accessed January 23, 2022), a true and correct copy of which is attached hereto as **Exhibit A**.

<u>Schwarz's Employment with Commvault</u>

14.     Schwarz worked for Commvault from March 2021 to January 2022 as Senior Director, Metallic Americas Sales and his exposure to Commvault's strategy, performance metrics, and methods of succeeding in the marketplace was broad.

15.     While at Commvault, Schwarz was responsible for overseeing the end-to-end operations of Metallic's sales business for all of North and South America.  He was responsible

---

[1] *See* https://www.commvault.com/cohesity-vs-commvault (last accessed Jan. 23, 2022).

for positioning, negotiating, and closing Metallic sales and identifying and developing potential enterprise-level customer relationships, alliance and technology partnerships.

16.     Schwarz was responsible for being the initial point of contact with prospective customers and partners, regularly meeting with key decision-makers at those entities, and facilitating negotiations with partners or customers. He served as the face of Metallic for customers and partners in North and South America.

17.     Schwarz was also responsible for executing the sales strategies for Metallic, driving Metallic's sales campaigns, overseeing daily sales operations related to Metallic, providing market forecast guidance for Metallic, recruiting and training Metallic's sales team, and communicating messaging and competitive positioning updates to his team in the field.

18.     Schwarz worked closely with Commvault's senior leadership in territory planning, deal strategy, organizational alignment, product strategy, and driving the overall growth of Commvault's sales business.

19.     To perform his duties at Commvault, Schwarz was repeatedly and extensively exposed to Commvault's most critical trade secrets and other confidential information in the areas described above and incorporated here, which Commvault has expended significant time, resources, money, and effort in developing.  This includes information relating to Commvault's ability to successfully compete – including, specifically, as against Commvault's Direct Competitor, Cohesity – and grow in the marketplace.

20.     Specifically, Schwarz was given access to Commvault's trade secrets and other highly-confidential information concerning customers and active prospect lists (including their business needs and preferences, their product feedback, and their purchase histories and estimated profitability), past, current, and in-development sales proposals (including value and

profitability of each), customer account and opportunity valuations, Metallic's (and Commvault's) financial analysis and outlook, key business partners, business plans and strategies, marketing plans, internal market analyses and intelligence, Metallic-specific training materials and competitive strengths and weaknesses, market forecasts and go-forward strategies, sales data (including, among other things, projections, volume of sales, win-loss analyses, and customer feedback/win-back reports), promotional materials and methods, and policies and procedures (collectively, "Highly Confidential Information").

21.     Further, through his work for Commvault, Schwarz has developed a deep knowledge of Metallic's internal, confidential sales model and operations, which allows Commvault to support one of the fastest growing SaaS data-protection platforms in the industry. In particular, Schwarz had knowledge of Metallic's tactical sales strategies, and customer success and retention playbook, including customer satisfaction reports, win-loss reports, and market forecasts.

22.     Schwarz also knows and took with him the detailed specifics of sales opportunities that Commvault has identified with respect to its existing and prospective customer accounts.  This includes, among many other things, the particular Commvault solutions selected and/or recommended for each sales opportunity, and how to competitively market those solutions to particular customers.  Commvault has spent significant time and resources exploring, analyzing, and developing these opportunities.

23.     In connection with Schwarz's responsibilities for his sales team, he helped execute, and had access to, Metallic's proprietary sales process and associated training materials. In connection with his knowledge of Metallic's sales business and customer opportunities, this information would provide a competitor, such as Cohesity, with a complete guide to (unfairly)

undercutting or outselling Commvault in the market. Schwarz's knowledge of this currently active information would be impossible for him to disregard at this time, especially when competing against Commvault.

24.     Schwarz also had access to Metallic's current and upcoming sales pipeline (covering future quarters), including contract terms and customer proposals as well as comparable information for other aspects of Commvault.

25.     Schwarz's engagement with Commvault and Metallic's business operations and strategic planning was extensive. In just the few weeks before his departure, as discussed below, Schwarz participated in several high-level internal team meetings covering up-to-date sales performance metrics, the sales business priorities and pipelines, and the forecasts and strategies of Commvault's sales leadership team.

26.     The foregoing knowledge would provide Commvault's Direct Competitor with a substantial unfair competitive advantage immediately when coming head-to-head against Commvault in the market. Schwarz's knowledge of that information would be impossible for him to disregard.

27.     Quite simply, Schwarz knows all aspects of Commvault's strategic sales roadmap, its prospective customer targets, partner engagement playbook, proprietary sales techniques, and plans for competitive market positioning. This is mission-critical, competitively-sensitive, confidential information that Commvault and over 400 of its team members has invested substantial time and resources developing and implementing.

28.     If Schwarz were to work for a competitor like Cohesity at this moment, his deep knowledge of this information would necessarily inform his decisions about how to effectively – and unfairly – compete with Commvault. A competitor armed with such an advantage would

jeopardize Commvault's competitive strategies, customer and partner relationships, and valued market position.  This is one of the very reasons that Commvault undertakes great efforts to limit access to (and keep secret) its Highly Confidential Information, and uses and relies on strong trade secret laws and noncompetition and nondisclosure agreements.

29.     This information has significant competitive and economic value to Commvault and could, if learned by a competitor like Cohesity, provide significant value to the competitor, essentially allowing Commvault's Direct Competitor to "jump the line" where Commvault has dedicated substantial time and resources to reaching its well-earned industry-leading position.

30.     Upon information and belief, because of the nature of Cohesity's business and its direct competition with Commvault, it would not be possible for Schwarz to work at Commvault's Direct Competitor in his planned role for at least several months without using Commvault's Highly Confidential Information – including its most-critical trade secrets – even if unintentionally.

31.     Schwarz's misconduct in taking Commvault's information, up to literally the moment just before he resigned from Commvault, suggests that his use and disclosure of Commvault's trade secrets is intentional, and in fact, he intends to use Commvault's Highly Confidential Information to succeed immediately in his new role at Commvault's Direct Competitor; if not prevented by this Court.

COMMVAULT SAFEGUARDS ITS HIGHLY CONFIDENTIAL INFORMATION

32.     Commvault's Highly Confidential Information, including its trade secrets, provide Commvault with a significant competitive and economic advantage because of the proprietary nature and secrecy of the information, none of which is publicly known.

33.     Commvault is a data protection company.  Its very business is to protect the data of its customers.  To protect its Highly Confidential Information and trade secrets, Commvault has implemented numerous security measures.  For example, access to Commvault's physical properties is controlled and monitored through the use of security guards, passes, and identification badges.  Entry to and exit from Commvault facilities is controlled, and access is allowed only to authorized individuals.

34.     Similarly, access to Commvault's computers (where most of Commvault's Highly Confidential Information is maintained) is limited through the use of – among other things – company-issued usernames, passwords that must be changed regularly, encryption, anti-malware software, and firewalls.  Additionally, if employees are accessing Commvault's systems from an outside network (*i.e.*, they are not physically present in a Commvault office), they must execute a multi-factor authentication process.

35.     In fact, if employees try to access certain electronic documents from a non-company-issued device, they are prompted to enter their Commvault-issued company credentials before being granted access to such documents.  And, even with proper credentials, access to certain parts of Commvault's computer network and files containing Highly Confidential Information is on a need-to-know only basis.

36.     Additionally, Commvault has electronic systems in place that monitor activity such as the accessing and downloading of files and information from Commvault's networks and computers to portable devices or personal email accounts.

37.     As part of its effort to protect its Highly Confidential Information (including its trade secrets), Commvault requires employees who will have access to its Highly Confidential Information to agree to the application of New Jersey law in their obligations under

nondisclosure agreements and appropriate restrictive covenants that each signs as a prerequisite of employment.

38.     Commvault also requires employees to comply with a Confidential Information Policy that includes the requirement to protect Commvault information.  Further, Commvault has implemented corporate policies and trainings to protect its Confidential Information, including information technology security guidelines that, *inter alia*, strictly limit the downloading, copying, or distribution of the company's confidential information by its employees, except as specifically authorized and required for the performance of the employee's duties.  Indeed, employees, including Schwarz, receive training on how to safeguard Commvault's information. To further protect its information, Commvault terminates employees' electronic access immediately upon termination of employment, which it did with respect to Schwarz.

39.     Commvault's Highly Confidential Information is made available on a need-to-know basis.  For example, access to trade secrets and other highly competitive and sensitive strategy information about certain Commvault business metrics is accessible only on a limited basis, and is only shared with a very limited audience, such as the Board of Directors (which is also subject to strict confidentially obligations), on a scheduled basis and under conditions requiring confidentiality.  Similarly, early pipeline opportunities – like those misappropriated by Schwarz – are only shared with employees that have been selected to work on the particular opportunity.

SCHWARZ'S RESTRICTIVE COVENANTS

40.     As a condition of his employment with Commvault, and in consideration of, among other things, receiving senior level compensation and benefits, Schwarz signed the

Employee Invention, Confidentiality, Non-Competition, Non-Solicitation and Ethics Agreement (the "Agreement"), a true and correct copy of which is attached hereto as **Exhibit B**.

41.     Schwarz agreed in sections 6 and 8 of the Agreement that he would protect and safeguard Commvault's Highly Confidential Information and would not use or disclose such information, except solely and exclusively in performing his duties as an employee of Commvault.  Schwarz's misappropriation of Commvault's Highly Confidential Information on the eve of his departure (and other times) was a breach of these provisions, and his new employment with Commvault's Direct Competitor is an immediate and inevitable breach of these sections of the Agreement.

42.     In section 7 of the Agreement, Schwarz agreed that upon termination of his employment, he would promptly return all Commvault company information containing any Commvault Highly Confidential Information.  Schwarz breached this obligation by not only taking Highly Confidential Information on the eve of his departure, but then pretending that he planned to look to see what Commvault information he might have and would delete it, rather than return it.

43.     In section 13 of the Agreement, Schwarz agreed that he would not, for a period of twelve (12) months following his termination, "directly or indirectly . . . engage or participate in any business that is in competition in any manner whatsoever with the business of Commvault in any geographic region or area in which [he] performed services for Commvault and/or on or for any customer account for which [he] performed services for Commvault . . . ."  Schwarz's employment by Cohesity in his planned role is a breach of this section.

44.     In section 13 of the Agreement, Schwarz also agreed that he would not, for a period of twelve (12) months following his termination, "directly or indirectly hire, seek to hire .

. . any current employee of Commvault" or "directly or indirectly: divert or attempt to divert from Commvault . . . any business or customers of Commvault . . . ."

45.     In section 15 of the Agreement, Schwarz agreed that in the event of his breach of the above obligations to Commvault (among others) in addition to other remedies which may be available, Commvault has the right to seek a restraining order and/or an injunction against him.

SCHWARZ'S SHIFTING LOYALTIES AND ASSOCIATED STRATEGIC MISAPPROPRIATION

46.     Commvault's Direct Competitor began recruiting members of the Metallic team at least as early as the beginning of November 2021.  Upon information and belief, Schwarz was in touch with Commvault's Direct Competitor on or before November 4, 2021.

47.     On November 4, 2021, Schwarz sent to himself (directed to his personal Gmail account) an email with an attached internal, confidential Commvault Excel spreadsheet detailing how Commvault has aligned its Customer Success Manager, Inside Sales, and Outside Sales organizations.

48.     On November 8, 2021, Schwarz then sent himself an email that includes Metallic's internal, confidential financial bookings information for the past seven quarters and the inflow report (a report showing the sales pipeline and prospects) by district across North America for the third quarter of 2022 (Commvault's fiscal year runs from April 1 through March 31; we are currently in Q4 2022).

49.     Neither transmission related to any then-pending request from Commvault management, nor to any report requested by Commvault.

50.     On November 22, 2021, Schwarz met with Commvault's Direct Competitor's (then) Vice President of Worldwide Field Operations, Nicolas Day.  The invitation for that meeting specifically referenced "DMaas" as the subject of the meeting (the "DMaas Meeting").

14

51.     On December 1, 2021, Schwarz met with Commvault's Direct Competitor's Vice President of Sales, Americas, Joe Tarantino.

52.     Upon information and belief, Schwarz began to shift his loyalties to Commvault's Direct Competitor sometime before or during these interviews.  His misappropriation of Commvault's information *escalated* accordingly. The following is a sampling of the confidential Commvault information that Schwarz forwarded to his personal Gmail account without any then-current assigned deliverable from Commvault superiors and with *no legitimate Commvault-related reason for doing so* after his "DMaaS meeting" with Commvault's Direct Competitor:[2]

    a.  December 1, 2021 (the same day of his meeting with Commvault's Direct Competitor's Vice President of Sales, Americas): an email relating to a particular client that illustrates Metallic's sales method (a method developed following substantial time and financial investment by Commvault).

    b.  December 1, 2021 (again, the same day of his meeting with Commvault's Direct Competitor): an email attaching a PowerPoint deck with confidential and proprietary competitive analysis.

    c.  December 3, 2021: an email attaching a PowerPoint deck related to a confidential and proprietary client proposal for a deal that is still pending.

    d.  December 3, 2021: an email detailing a situation in which Commvault was in active competition ***with Cohesity*** for a particular

---

[2] Documents discussed herein containing Commvault's Highly Confidential Information have been filed under seal.  Certain redactions have been made to document titles in this Verified Complaint to protect that information.

client's business.  The email contains a discussion of the confidential

and proprietary measures Commvault was willing to put in place and

the concessions it was willing to make to compete with Cohesity.

e.  December 7, 2021: an email detailing Metallic's confidential and

proprietary renewal performance, with financials, in various

geographic regions.

f.  December 14, 2021: an email detailing the confidential and

proprietary performance of Metallic's Account Executives and clients

with pending deals and confidential financials.

g.  December 22, 2021: An email attaching an Excel spreadsheet that

details confidential and proprietary secured deals and pending

opportunities with client names, detailed financials, and associated

Commvault employees.

h.  January 4, 2022: Emails containing address information for more than

a dozen Metallic team members.

53.     On or around January 5, 2022, Schwarz informed Commvault that he intended to

accept a position with Commvault's Direct Competitor.

54.     Commvault went to great pains over the ensuing week to retain Schwarz

recognizing not only the value he brought to the company, but also his intimate knowledge and

understanding of Commvault's trade secrets related to Metallic and Commvault.

55.     On January 11, 2022, Schwarz assured Commvault that "I have removed myself

from further consideration at Commvault's Direct Competitor, I am committed to our joint go-

forward at Commvault."

56.     Schwarz's commitment to stay at Commvault was a charade.  He did not stay. Instead, he used that additional time to further plunder confidential and proprietary information from Commvault for Cohesity's benefit. Upon information and belief, he maintained his access and collected Commvault's trade secrets and other confidential information, and worked to keep his connections with critical customer and partner relationships as long as possible.  Ultimately, Schwarz secured, and accepted, a new offer from Cohesity, and resigned (again) from Commvault in the early morning hours on January 19, 2022.

57.     Following Cohesity's initial outreach and continuing through the final weeks – *literally down to the last hours – of his employment, Schwarz accessed, viewed, downloaded, and emailed himself substantial amounts of Commvault's most critical Highly Confidential Information, effectively mining Commvault for virtually everything he would need to jumpstart Cohesity's competitive DMaaS offering and ensure its success.*

58.     By way of example, set forth below are highly confidential files that Schwarz downloaded or accessed (and therefore at a minimum reviewed, but potentially worse, may have also photographed, taken notes of or forwarded) in the lead up to his January 19, 4:20 AM PT resignation:

| | | |
|---|---|---|
| 1/18/2022, 4:05:27.000 PM[3] | Accessed | Metallic CVLT side-by-side v3.pptx |
| 1/18/2022, 4:04:25.000 PM | Accessed | Metallic CVLT side-by-side v3.pptx |
| 1/18/2022, 6:29:36.000 PM | Downloaded | Metallic_Internal_Metallic_CVLT_Comparison-Guide-Cheat Sheet_v1.6.pdf |
| 1/18/2022, 2:31:53.000 PM | Accessed | Customer Support and Success Weekly Update.pptx |
| 1/18/2022, 6:23:48.000 PM | Accessed | [REDACTED]- Echobacks for Top Deals.pdf |

---

[3] All times in this table are 24-hour times, all in the eastern time zone.  Shaded cells indicate activity the day before resignation by Schwarz.

| | | |
|---|---|---|
| 1/18/2022, 6:23:48.000 PM | Accessed | [REDACTED] - Echobacks for Top Deals.pdf |
| 1/18/2022, 4:13:22.000 PM | Downloaded | Metallic_Internal_Metallic_CVLT_Comparison-Guide-Cheat Sheet_v1.6.pdf |
| 1/18/2022, 5:58:03.000 PM | Accessed | [REDACTED]  Executive Summary_Metallic Endpoint_Nov 12.pptx |
| 1/18/2022, 5:57:41.000 PM | Accessed | AllItems.aspx |
| 1/18/2022, 5:58:49.000 PM | Downloaded | [REDACTED] Executive Summary_Metallic Endpoint_Nov 12.pptx |
| 1/18/2022, 6:22:04.000 PM | Accessed | EchoBack Statement Sample.pdf |
| 1/18/2022, 6:22:48.000 PM | Accessed | [REDACTED] Only (002).pptx |
| 1/18/2022, 6:23:18.000 PM | Downloaded | [REDACTED] Only (002).pptx |
| 1/18/2022, 6:22:25.000 PM | Downloaded | EchoBack Statement Sample.pdf |
| 1/18/2022, 6:20:26.000 PM | Accessed | [REDACTED] Executive Summary - Metallic O365 Project - Final.pdf |
| 1/18/2022, 6:20:07.000 PM | Accessed | AllItems.aspx |
| 1/18/2022, 6:21:04.000 PM | Accessed | Metallic [REDACTED]- Updated.pptx |
| 1/18/2022, 6:20:26.000 PM | Accessed | [REDACTED] Executive Summary - Metallic O365 Project - Final.pdf |
| 1/18/2022, 6:21:36.000 PM | Downloaded | Metallic [REDACTED] - Updated.pptx |
| 1/18/2022, 6:22:04.000 PM | Accessed | EchoBack Statement Sample.pdf |
| 1/18/2022, 6:27:57.000 PM | Downloaded | [REDACTED] - Echobacks for Top Deals.pdf |
| 1/18/2022, 6:29:42.000 PM | Downloaded | Metallic CVLT side-by-side v3.pptx |
| 1/17/2022, 10:49:18.000 PM | Accessed | Demand Gen Measurement 1172022.xlsx |
| 1/14/2022, 5:31:29.000 PM | Accessed | 211205 -  [REDACTED]-CVLT [REDACTED] Co-Sell vFinal(OldvNew).pptx |
| 1/14/2022, 5:30:50.000 PM | Accessed | 211202 -  [REDACTED]-CVLT [REDACTED] Co-Sell vFinal.pptx |

| 1/11/2022, 9:53:12.000 AM | Accessed | Metallic FY22 Q4 QBR_011022.pptx |
|---|---|---|
| 1/7/2022, 2:42:47.000 PM | Accessed | Metallic Win-Loss EMEA Q3.pptx |
| 1/7/2022, 1:55:30.000 PM | Accessed | Metallic Win-Loss EMEA Q3.pptx |
| 1/7/2022, 2:17:48.000 PM | Accessed | Metallic Loss US.pptx |
| 1/4/2022, 7:25:32.000 PM | Accessed | Customer Support and Success Weekly Update.pptx |
| 1/4/2022, 6:58:00.000 PM | Accessed | Customer Support and Success Weekly Update.pptx |
| 1/4/2022, 6:57:59.000 PM | Accessed | Customer Support and Success Weekly Update.pptx |
| 1/4/2022, 6:57:56.000 PM | Accessed | 211205 - [REDACTED]-CVLT [REDACTED] Co-Sell vFinal(OldvNew).pptx |
| 1/4/2022, 5:52:16.000 PM | Accessed | 211205 - [REDACTED]-CVLT [REDACTED] Co-Sell vFinal(OldvNew).pptx |
| 1/4/2022, 5:50:58.000 PM | Accessed | 211202 - [REDACTED]-CVLT [REDACTED]s Co-Sell vFinal.pptx |
| 1/4/2022, 5:23:45.000 PM | Accessed | 211202 - [REDACTED]-CVLT [REDACTED] Co-Sell vFinal.pptx |
| 1/4/2022, 5:25:15.000 PM | Accessed | 211205 - [REDACTED]-CVLT [REDACTED] Co-Sell vFinal(OldvNew).pptx |
| 12/30/2021, 4:48:54.000 PM | Accessed | Inflow by Sales Specialists CY2021 12.30.21.pptx |
| 12/30/2021, 11:13:16.000 AM | Accessed | Demand Gen Measurement 12202021.xlsx |
| 12/30/2021, 2:36:54.000 PM | Downloaded | Path to $[REDACTED] 123021.xlsx |
| 12/29/2021, 11:11:33.000 PM | Downloaded | Path to $[REDACTED] 122921.xlsx |

59.     The Highly Confidential Information in these files is extremely valuable to Commvault, and would give Commvault's Direct Competitor a significant head start, at Commvault's expense.

60.     By way of example, many of the documents, including the following, provide Schwarz and Commvault's Direct Competitor with the pipeline of active deals with customers that Commvault is actively pursuing, the strategy that is being used to negotiate the sales, and the people involved:

    a.   The document entitled 211205 -  MSFT-CVLT [REDACTED]Co-Sell vFinal(OldvNew).pptx that Schwarz accessed on January 14, 2022 (while he was presumably renegotiating his employment with Commvault's Direct Competitor) is a detailed, confidential and proprietary client proposal for a deal that has not yet closed.

    b.   The document entitled Demand Gen Measurement 1172022.xlsx that Schwarz accessed on January 17, 2022 (two days before his resignation) is a complete report on Metallic confidential and proprietary opportunities across the entire Americas business, inclusive of every product, and ***inclusive of every sales representative in the entire organization***.

    c.   The document entitled Customer Support and Success Weekly Update.pptx that Schwarz accessed on January 18, 2022 (the day before he resigned) is an extensive inside look into Metallic's confidential and proprietary customer operations.  It includes, among other things, process workflows, Metallic's strategic approach to customer services, performance metrics, forward-looking roadmap, and development priorities.  Put simply, this document provides insight into how Metallic is run end-to-end.

      d.   That same day (January 18 – the day before he resigned), Schwarz

accessed documents related to two additional pending client

opportunities.

61.    Upon information and belief, Schwarz took additional information ***by taking***

***photographs*** of his computer screen, including of the files accessed in the hours before he

resigned.  Schwarz had done so on at least one occasion in October, ***forwarding a picture of a***

***slide being shared in a virtual meeting to his personal email account***.  Although the universe of

what he has demonstrably misappropriated is already vast, it is in fact likely far broader.

62.    The documents discussed above are highly confidential.  Their distribution is

guarded even within Commvault and is limited to senior management and their direct reports

actively working on customer proposals.

63.    Schwarz had no Commvault-related reason to send confidential Commvault

information to his personal email account.  Indeed, such practice was prohibited by company

policy.  Nor did he have any Commvault-related reason to access, much less download, highly

sensitive documents immediately before departing for a direct competitor.

64.    Further, as a high-level manager devoted to selling data-security and data-

protection services, Schwarz knew or should have known the inherent risk and lack of necessity

to any Commvault business goal in moving Commvault proprietary information to and through

personal email platforms, making clear that such activity was not in furtherance of a data

protection company agenda.

65.    Additionally, contrary to the statement in his resignation email (*see* Exhibit C)

that he had kept himself "at some arm's length," Schwarz continued – despite being in active

discussions with a direct competitor – to attend meetings at which critical Highly Confidential Information was discussed.

66.     For example, on December 13, 2021, Schwarz attended a Metallic Business Management Team Meeting, which was associated with a 202-slide PowerPoint deck covering in great detail numerous aspects of Metallic's current performance, forward-looking plans, priorities, pipeline, top deals, wins and losses (for customer business), and how to better compete – including specifically against Commvault's Direct Competitor. On January 4, the day before providing notice (the first time) of his intention to move to Commvault's Direct Competitor, he attended a Metallic Sales Leadership meeting at which leadership discussed the future of the business and discussed forward-looking priorities.

67.     When taken together, the universe of up-to-the-minute information (including proven demand-generation techniques and targeting strategies and proprietary sales strategies developed for DMaaS) that Schwarz downloaded, emailed to himself, and/or accessed (and presumably reviewed, if not also photographed or, at a minimum, took notes of) provides him (and now Cohesity) with the ability to recreate and then compete with Metallic's operational and sales structure.

68.     <u>What Schwarz inherited and then stole was the collective work of over 400 people in Commvault's sales, marketing, pre-sales, operations, customer success, and partner teams, and the Americas business unit. This collective work was almost two years in the making with a lot of learning, wins, and losses along the way that shaped what Commvault is today, as well as the blueprint for success going forward.</u> ***It is nothing short of a roadmap to Commvault's proprietary demand generation and targeting strategy, proprietary sales playbook developed***

*for DMaaS, and current active stream of customer opportunities. It is the paradigm of misappropriation and unfair competition.*

69.     Commvault's trade secrets and other Highly Confidential Information are immediately at risk if Schwarz is permitted to begin and/or continue his employment with Cohesity for some time.

70.     This highly confidential, competitively sensitive information is precisely the type of information that Schwarz is inevitably – whether intentionally or inadvertently – to unlawfully use in his new role with Cohesity.

<u>SCHWARZ'S RESIGNATION AND ATTEMPT TO CONTROL THE NARRATIVE</u>

71.     On January 19, 2022, at 4:20 AM PT (local time for Schwarz), Schwarz emailed that he was leaving for Commvault's Direct Competitor.  A true and correct copy of that email is attached hereto as **<u>Exhibit C</u>**.

72.     Schwarz's lengthy resignation notice is a naked attempt to proactively manufacture a narrative in which he portrays himself as having only the best of intentions toward Commvault.

73.     The opposite is true.

74.     When his self-serving statements are stripped away, the resignation notice is a stark admission of his intentions:

   a.   He is going to work for Commvault's ***direct competitor in precisely the same space*** – DMaaS.

   b.   ***He will be doing for Commvault's Direct Competitor precisely what he did for Commvault – building a Metallic equivalent***.  As he stated, "The proposed position affords me the ability to **work**

**very closely in shaping Cohesity's DMaaS go forward** . . . ."

*See* Exhibit C (emphasis added).

75.     In the resignation notice, he attempts to deflect Commvault's attention from his misconduct.  While he professes to have kept himself "at some arm's length" to "respect the business here and minimize conflicts", his actual conduct, detailed above, is in stark contrast to his contrived narrative.

76.     Upon receiving Schwarz's resignation, Commvault immediately terminated his access to all Commvault systems and requested that he allow the company time to process and message his departure.

77.     Schwarz had other plans.

78.     Rather than provide that routine courtesy to his employer – or even tell Commvault that he would not allow them that time – Schwarz instead promptly emailed yet another self-serving, lengthy email to almost 150 Commvault employees.  A true and correct copy of that email is attached hereto as **Exhibit D**.

79.     In that email, Schwarz acknowledges that Cohesity views Metallic as the industry leader and attempts to downplay the competitive threat.  Despite his efforts to sidestep the obvious, there is no conclusion to be drawn other than that he is going to Commvault's Direct Competitor to aid them to overcome Metallic using his extensive insider knowledge of Metallic's technology, market and customer success.

80.     Additionally, that email makes clear that he is already setting the stage to court Commvault employees to join him.  He touts the impliedly-handsome compensation package he was offered by Commvault's Direct Competitor, paving the way for future solicitations.

24

<u>SCHWARZ'S NEW ROLE WITH COHESITY</u>

81.     Upon information and belief, including Schwarz's own admissions in his resignation notices, Schwarz's new position at Commvault's Direct Competitor, much like his former role with Commvault, will entail development and oversight of a DMaaS offering in direct competition with Metallic.

82.     Given the similarity in the roles, the depth and breadth of Schwarz's knowledge of Metallic's business, plans, strategies, customer pipeline, and other critical business operations, and sales information, especially when coupled with his (known) misconduct to date, it would be impossible for Schwarz to work at Cohesity for some reasonable amount of time without relying upon Commvault's Highly Confidential Information (including Commvault's most competitively-sensitive and valuable trade secrets).  Indeed, given the targeted nature of Schwarz's theft of information, that appears to be precisely his plan.

83.     Further, since his resignation, Schwarz has doubled down on his efforts to perpetuate his façade of loyalty and proactively craft a narrative in which he is operating in good faith.  Specifically, he reached out to Commvault on January 21, 2022, stating that he was "scouring" his "personal system" to ensure he has no Commvault intellectual property, presumably hoping to avoid Commvault from believing it needed to investigate whether he engaged in any misappropriation "on his way out the door."  However, such a statement from an individual who was, in reality, "scouring" *Commvault's systems* for the most useful information for Commvault's Direct Competitor mere days before is tantamount to an outright admission of his *intentional* misappropriation and plans for it to continue.

<u>HARM TO COMMVAULT</u>

84.     After Schwarz's manipulative handling of the offer and acceptance process, and his admission that he would be going to Commvault's Direct Competitor to try to outdo Metallic, Commvault promptly began investigating his conduct.  While Commvault does not yet have the results of a third-party forensic review of Schwarz's Commvault laptop and accounts – and while Commvault does not have access to Schwartz's personal devices and accounts – ***the misconduct already uncovered is nothing short of astonishing***.

85.     As stated above, Schwarz has repeatedly been exposed to competitively-sensitive Highly Confidential Information, substantial amounts of which he took with him when he left. His knowledge of this information – both what he knows and what he took – would provide a substantial unfair competitive advantage to Commvault's Direct Competitor.  Indeed, Schwarz's intimate, detailed knowledge of Commvault's Highly Confidential Information, coupled with his statements and conduct (including unlawfully *taking* with him to Commvault's Direct Competitor some of the most valuable Highly Confidential Information), demonstrate not just the inevitability of his use of that information for Commvault's Direct Competitor, but an intention to use it to unfairly compete with Commvault.

86.     Schwarz's extensive understanding of Metallic's business model, including its sales model, pipeline, and go-forward strategy is incredibly useful information to a competitor of Commvault that is looking to build out its DMaaS offering.  It is exactly the information to which Schwarz was repeatedly and constantly exposed and helped develop, and which he reviewed and took with him on the way out the door, that would impart a significant and unfair competitive advantage to Schwarz and Cohesity.

87.     Unless Schwarz is stopped from working with Commvault's Direct Competitor for some reasonable period of time and prevented from using or disclosing – intentionally or inadvertently – Commvault's trade secrets (and all of Commvault's Highly Confidential Information), Commvault is facing the very serious risk that its trade secrets and other confidential and proprietary information, which it has developed at great expense and effort, will be placed directly into the hands of one of its direct competitors, thereby irreparably harming Commvault.

88.     Given the imminent and substantial risk that Schwarz poses, Commvault commenced this action to protect its legitimate business interests.

## FIRST CAUSE OF ACTION

### (Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836)

89.     Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

90.     Commvault is the owner of trade secrets and other proprietary or confidential information related to Metallic and other data-management services.  These trade secrets are described generally above and comprise financial, business, technical, economic, and/or engineering information that are used in or intended for use in interstate commerce and that accordingly constitute "trade secrets" under 18 U.S.C. § 1839(3).

91.     Commvault has taken reasonable steps to maintain the secrecy of its trade secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Commvault's trade secrets and by taking the other reasonable measures described above.

92.     These confidential and proprietary trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by

another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on Commvault over others in the relevant market.

93.    Other than through Schwarz's likely improper disclosure, the trade secrets are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

94.    In his position with Commvault, Schwarz had access to trade secrets and other nonpublic Highly Confidential Information that is of extraordinary value to Commvault. Schwarz knows the confidentiality, ownership, and use restrictions of Commvault's trade secrets and Highly Confidential Information.

95.    Commvault expended significant amounts of time and money growing its base of customers and developing its products and Highly Confidential Information, including its trade secrets, all of which are highly valuable to Commvault and to any other person or entity that renders the same or similar services, such as Cohesity.

96.    Commvault's Highly Confidential Information, including trade secrets, are related to a product or service used in interstate or foreign commerce.

97.    Schwarz misappropriated Commvault's Highly Confidential Information and trade secrets by improper means and without authorization while working (or threatening to work) for Cohesity in violation of his Agreement in a position in which it is not possible for him not to make use Commvault's trade secrets.  Commvault's investigation of Schwarz's conduct, which is ongoing, has identified several instances of this misappropriation by Schwarz, including some described above.

98.    Schwarz's actual and threatened use and disclosure of the trade secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, Schwarz

knew or had reason to know that their knowledge of the trade secrets was derived through persons who owed a duty to Commvault to maintain the secrecy of the trade secrets.

99.     Moreover, upon information and belief, Schwarz has misappropriated Commvault's trade secrets by taking, after a time he had any legitimate business reason for doing so, and retaining highly confidential Commvault documents in violation of the Agreement and his other obligations to Commvault.

100.     Schwarz's conduct was willful and malicious, entitling Commvault to an award of exemplary damages and attorney's fees under 18 U.S.C. § 1836(b)(3)(C) and (D).

101.     As a result of Schwarz's actual and threatened misappropriation, Commvault has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Commvault will be without an adequate remedy at law.

102.     Commvault is also entitled to recover compensatory and exemplary damages from Schwarz, including but not limited to the losses resulting from his wrongful conduct and any unjust enrichment caused by their misappropriation.  The amount of such relief cannot be determined precisely at this time.

## SECOND CAUSE OF ACTION

### (Violation of the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2)

103.     Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

104.     Commvault is the owner of trade secrets and other proprietary or confidential information related to Metallic and other data-management services.  These trade secrets are described generally above and comprise business data compilation, program, device, method,

technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "trade secrets" under N.J.S.A. 56:15-2.

105.    Commvault has taken reasonable steps to maintain the secrecy of its trade secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Commvault's trade secrets and by taking other reasonable measures described above.

106.    These confidential and proprietary trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on Commvault over others in the relevant market.

107.    Other than through Schwarz's likely improper disclosure, these trade secrets are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

108.    In his position with Commvault, Schwarz had access to trade secrets and other nonpublic Highly Confidential Information that is of extraordinary value to Commvault. Schwarz knows the confidentiality, ownership, and use restrictions of Commvault's trade secrets and Highly Confidential Information.

109.    Commvault expended significant amounts of time and money growing its base of customers and developing its products and Highly Confidential Information, including its trade secrets, all of which are highly valuable to Commvault and to any other person or entity that renders the same or similar services, such as Cohesity.

110.    Schwarz misappropriated Commvault's Highly Confidential Information and trade secrets by improper means and without authorization working (or threatening to work) for

Cohesity in violation of his Agreement in a position in which it is not possible for him not to make use Commvault's trade secrets.  Commvault's investigation of Schwarz's conduct, which is ongoing, has identified several instances of this misappropriation by Schwarz, including some described above.

111.    Schwarz's actual and threatened use and disclosure of the trade secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, Schwarz knew or had reason to know that their knowledge of these trade secrets was derived through persons who owed a duty to Commvault to maintain the secrecy of the trade secrets.

112.    Moreover, upon information and belief, Schwarz has misappropriated Commvault's trade secrets by taking, after a time he had any legitimate business reason for doing so, and retaining highly confidential Commvault documents in violation of the Agreement and his other obligations to Commvault.

113.    As a result of Schwarz's actual and threatened misappropriation, Commvault has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Commvault will be without an adequate remedy at law.

114.    Commvault is also entitled to recover compensatory and exemplary damages from Schwarz, including but not limited to the losses resulting from his wrongful conduct and any unjust enrichment caused by their misappropriation.  The amount of such relief cannot be determined precisely at this time.

## THIRD CAUSE OF ACTION

### (Misappropriation of Trade Secrets, New Jersey Common Law)

115.    Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

116.    Commvault is the owner of trade secrets and other proprietary or confidential information related to Metallic and other data-management services.  These trade secrets are described generally above and comprise business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "confidential information" under New Jersey Common Law.  This Common Law claim is alleged as an alternative to the contract claims pled herein.

117.    Commvault has taken reasonable steps to maintain the secrecy of its trade secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Commvault's trade secrets and by taking other reasonable measures described above.

118.    These confidential and proprietary trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on Commvault over others in the relevant market.

119.    Other than through Schwarz's likely improper disclosure, these trade secrets are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

120.    In his position with Commvault, Schwarz had access to trade secrets and other nonpublic Highly Confidential Information that is of extraordinary value to Commvault.

Schwarz knows the confidentiality, ownership, and use restrictions of Commvault's trade secrets and Highly Confidential Information.

121.    Commvault expended significant amounts of time and money growing its base of customers and developing its products and Highly Confidential Information, including its trade secrets, all of which are highly valuable to Commvault and to any other person or entity that renders the same or similar services, such as Cohesity.

122.    Schwarz misappropriated Commvault's Highly Confidential Information and trade secrets by improper means and without authorization by accessing, reviewing, downloading, and emailing himself such information, by any photographing and copying of such information, and by working (or threatening to work) for Cohesity in violation of his Agreement in a position in which it is not possible for him not to make use Commvault's trade secrets. Commvault's investigation of Schwarz's conduct, which is ongoing, has identified multiple instances of this misappropriation by Schwarz, including some described above.

123.    Schwarz's actual and threatened use and disclosure of the trade secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, Schwarz knew or had reason to know that their knowledge of these trade secrets was derived through persons who owed a duty to Commvault to maintain the secrecy of the trade secrets.

124.    Moreover, upon information and belief, Schwarz has misappropriated Commvault's trade secrets by taking, after a time he had any legitimate business reason for doing so, and retaining highly confidential Commvault documents in violation of the Agreement and his other obligations to Commvault.

125.    As a result of Schwarz's actual and threatened misappropriation, Commvault has been damaged, and it will continue to suffer great and irreparable harm and damage.  The

amount of this irreparable harm will be difficult if not impossible to ascertain, and Commvault will be without an adequate remedy at law.

126.    Commvault is also entitled to recover compensatory and exemplary damages from Schwarz, including but not limited to the losses resulting from his wrongful conduct and any unjust enrichment caused by their misappropriation.  The amount of such relief cannot be determined precisely at this time.

**<u>FOURTH CAUSE OF ACTION</u>**

**<u>(Violation of the New Jersey Computer-Related Offenses Act, 2A:38A-3, et seq.)</u>**

127.    Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

128.    On or about December 29, 2021 through January 18, 2022, Schwarz purposefully or knowingly accessed the Commvault computer system in an unauthorized manner in violation of the New Jersey Computer-Related Offenses Act (the "CROA").

129.    By exceeding his authorized access to Commvault's computer network, and taking Commvault's Highly Confidential Information, Schwarz violated the provision of the CROA that imposes liability on any party who purposefully or knowingly takes any data, database, or computer program.

130.    By purposefully and knowingly accessing and obtaining data comprised of dozens of files, including some of Commvault's most sensitive information, Schwarz violated the provision of the CROA that imposes liability on any party who purposefully or knowingly accesses and obtains any data from a computer system or computer network.

131.     Commvault is entitled to an injunction under the CROA, which specifically provides that an enterprise alleging injury or loss may bring an action to enjoin actions causing damage.  N.J.S.A. 2A:38A-5.

132.     Commvault respectfully requests that the Court: (a) order that Schwarz immediately return and to Commvault and, with Commvault's oversight, destroy all Commvault information that he copied or otherwise took from Commvault; (b) enjoin Schwarz from using any Commvault information; (c) enjoin Schwarz from accessing, or attempting to access, Commvault's system or any data contained therein; (d) enjoin Schwarz from providing any Commvault information to any third party, including Cohesity; and (e) enter judgment in favor of Commvault and against Schwarz.

133.     Additionally, as a result of Schwarz's conduct, Commvault has incurred reasonable and necessary attorneys' fees and costs of investigation and litigation.  As such, Commvault respectfully requests that it be permitted to recover all costs of investigation, reasonable attorneys' fees and expenses, as provided by statute.

## FIFTH CAUSE OF ACTION

### (Breach of Contract)

134.     Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

135.     The Agreement, which Schwarz knowingly and willingly entered into, is a valid and enforceable contract.

136.     Among other things, Schwarz agreed in sections 6 and 8 of the Agreement that he would protect and guard Commvault's Highly Confidential Information and would not use or disclose such information except solely and exclusively in performing his duties as an employee of Commvault.

137.     In section 7 of the Agreement, Schwarz agreed that upon termination of his employment he would promptly return all Commvault company information containing any Commvault Highly Confidential Information.

138.     In section 13 of the Agreement, Schwarz agreed that he would not, for a period of twelve (12) months following his termination, "directly or indirectly . . . engage or participate in any business that is in competition in any manner whatsoever with the business of Commvault in any geographic region or area in which [he] performed services for Commvault and/or on or for any customer account for which [he] performed services for Commvault . . . ."

139.     In section 13 of the Agreement, Schwarz also agreed that he would not, for a period of twelve (12) months following his termination, "directly or indirectly hire, seek to hire . . . any current employee of Commvault" or "directly or indirectly: divert or attempt to divert from Commvault . . . any business or customers of Commvault . . ."

140.     In section 15E of the Agreement, Schwarz agreed that in the event of his breach of the above obligations to Commvault (among others) in addition to other remedies which may be available, Commvault has the right to seek a restraining order and/or an injunction against him.

141.     During his employment with Commvault, Schwarz had access to and was exposed to Commvault's confidential, proprietary and trade secret information.

142.     Schwarz's knowledge of Commvault's confidential, proprietary, and trade secret information provides him with an unfair direct competitive advantage vis-à-vis Commvault.

143.     Commvault has a legitimate protectable interest in its confidential, proprietary, and trade secret information, and in preventing use of such information to the detriment of Commvault.

144.     During his employment with Commvault, Schwarz was exposed to, developed, and maintained goodwill with Commvault's customers and employees.

145.     Commvault has complied with all of its obligations under the Employee Agreement.

146.     By the conduct alleged above, Schwarz has breached his obligations under the Agreement.

147.     As a result of Schwarz's breach of his contractual obligations, Commvault has suffered, and will continue to suffer, both irreparable harm and monetary damages in an amount to be proven at trial.

<u>**SIXTH CAUSE OF ACTION**</u>

<u>**(Breach of Good Faith and Fair Dealing)**</u>

148.     Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

149.     The Agreement between Commvault and Schwarz contains an implied covenant requiring that both parties act in good faith and deal fairly with each other, and that neither party take, or fail to take, any action that would deprive the other of the reasonably anticipated fruits that such party would enjoy under the Agreement.

150.     Through his foregoing unlawful conduct, Schwarz has materially breached the implied covenants of good faith and fair dealing in the Agreement and deprived Commvault of the benefit of its bargain with him.

151.     As a result of Schwarz's breach of the covenant of good faith and fair dealing, Commvault has suffered, and will continue to suffer, both irreparable harm and monetary damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Breach of Fiduciary Duties, New Jersey Common Law)

152.    Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if set forth herein.

153.    As an executive of Commvault, Schwarz was in a position of trust and confidence and had a duty of loyalty to Commvault to act in its interests under New Jersey Common Law. This Common Law claim is alleged as an alternative to the contract claims pled herein.

154.    Schwarz has a duty to safeguard the confidential and proprietary information entrusted to him solely as a result of the position he held at Commvault, as well as to refrain from unfairly competing with Commvault by using Commvault's trade secrets and, more broadly, Commvault's Highly Confidential Information.  Schwarz was Senior Director, Americas Sales for Metallic.

155.    By the conduct described above and realleged, Schwarz violated those duties, and instead acted in his own interests and contrary to the interests of Commvault.

156.    As a result of Schwarz's breach of his duties, Commvault has suffered, and will continue to suffer, both irreparable harm and monetary damages in an amount to be proven at trial.

## EIGHTHCAUSE OF ACTION

### (Breach of Duty of Loyalty, New Jersey Common Law)

157.    Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if set forth herein.

158.    Schwarz owed, and continues to owe, a duty of loyalty to Commvault because, under New Jersey law, every employee owes a duty of loyalty to his or her employee to not act

contrary to the employer's interests while employed.  This duty prohibits the disclosure of trade secrets or other confidential information of the employer, and it extends past an employee's termination.  Schwarz, as Senior Director, Americas Sales for Metallic, was an employee at Commvault and therefore owed Commvault a duty of loyalty that extends past his employment. This Common Law claim is alleged as an alternative to the contract claims pled herein.

159.    Schwarz knowingly breached his duty of loyalty by disclosing and/or using Commvault's trade secrets and Confidential Information for the benefit of Cohesity.  At the time of such disclosure and use, Schwarz knew or had reason to know that his knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of trade secrets and, more broadly, Commvault's Highly Confidential Information.

160.    By reason of the above-alleged acts and conduct of Schwarz, Commvault has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Commvault will be without an adequate remedy at law.

161.    Commvault is also entitled to recover compensatory damages and punitive damages from Schwarz.  The amount of such relief cannot be determined precisely at this time.

## NINTH CAUSE OF ACTION

### (Breach of Duty of Confidence, New Jersey Common Law)

162.    Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if set forth herein.

163.    Schwarz owed, and continues to owe, a duty of confidence to Commvault because, among other reasons, Commvault disclosed to him trade secrets and, more broadly,

Commvault's Highly Confidential Information based on his express and implied promise of confidentiality.

164.    Schwarz breached his duty of confidence by misappropriating Commvault's trade secrets, including disclosing and using the trade secrets without Commvault's express or implied consent.  At the time of the disclosure, Schwarz knew or had reason to know that his knowledge of the trade secrets and, more broadly, the Highly Confidential Information was acquired under circumstances giving rise to the duty to maintain the secrecy, and limit the use, of the trade secrets and Highly Confidential Information.

165.    By reason of the above-alleged acts and conduct of Schwarz, Commvault has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Commvault will be without an adequate remedy at law.

166.    Commvault is also entitled to recover compensatory damages and punitive damages from Schwarz.  The amount of such relief cannot be determined precisely at this time.

**TENTH CAUSE OF ACTION**

**(Conversion)**

167.    Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if set forth herein.

168.    Schwarz has intentionally and unlawfully exercised dominion over Commvault's property, including but not limited to, its confidential and proprietary information.

169.    Schwarz's conduct constitutes a conversion of Commvault's property contrary to New Jersey law.

170.     Schwarz's acts of conversion were committed willfully, knowingly, maliciously, and in conscious disregard of his legal obligations to Commvault.

171.     Schwarz's conduct has caused Commvault injury to its property and business.

172.     Further, Commvault has been irreparably harmed and will continue to be so harmed unless Schwarz is restrained and enjoined.

## ELEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

173.     Commvault repeats and realleges each and every allegation in the foregoing paragraphs as if set forth herein.

174.     Schwarz has retained the benefit of receiving all of the proceeds and value of the trade secrets and confidential information that he misappropriated from Commvault without reimbursement to Commvault.

175.     Without compensation to Commvault, Schwarz has exploited, and continues to exploit, such assets of Commvault in support of his employment with Cohesity, a direct competitor of Commvault.

176.     Consequently, Schwarz has been unjustifiably enriched and has caused Commvault to suffer monetary damages.

## JURY DEMAND

Commvault hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** for the reasons set forth above, Commvault respectfully requests that this Court:

A.      Grant temporary, preliminary, and permanent injunctive relief restraining and enjoining Schwarz from working for Cohesity for a reasonable period of time, requiring Schwarz to return and also destroy Commvault's property and information (whether trade secret, confidential, or proprietary), and restraining and enjoining Schwarz from otherwise violating his Agreement;

B.      Grant temporary, preliminary, and permanent injunctive relief restraining and enjoining Schwarz from retaining, using, or disclosing Commvault's trade secrets, and more broadly, any of Commvault's Highly Confidential Information;

C.      Enter judgment for Commvault on all Counts in this Complaint, and award damages to Commvault in an amount to be determined at trial, together with interest and costs;

D.      Award Commvault treble or double damages and attorneys' fees on Counts I and II, together with interest and costs; and

E.      Award all other relief this Court determines is appropriate.

DATED:  January 24, 2022                      EPSTEIN BECKER & GREEN, P.C.


By:     /s *James P. Flynn*
             James P. Flynn, Esq.
             Daniel R. Levy, Esq.
             EPSTEIN BECKER & GREEN, P.C.
             One Gateway Center
             Newark, NJ 07102
             (973) 642-1900 (phone)
             (973) 642-0099 (fax)
             Attorneys for Plaintiff
             Commvault Systems, Inc.

             *Co-Counsel*:

             Russell Beck (*pro hac vice* pending)
             BECK REED RIDEN LLP
             155 Federal Street, Suite 1302
             Boston, Massachusetts 02110
             Tel (617) 500-8660
             Fax (617) 500-8665

## CERTIFICATION UNDER L.CIV.R 11.2

This matter in controversy is not the subject of another action pending in any court, or any other pending arbitration or administrative hearing.

DATED:  January 24, 2022                    EPSTEIN BECKER & GREEN, P.C.

By:    /s *James P. Flynn*
        James P. Flynn, Esq.
        Daniel R. Levy, Esq.
        EPSTEIN BECKER & GREEN, P.C.
        One Gateway Center
        Newark, NJ 07102
        (973) 642-1900 (phone)
        (973) 642-0099 (fax)
        Attorneys for Plaintiff
        Commvault Systems, Inc.

        *Co-Counsel*:

        Russell Beck (*pro hac vice* pending)
        BECK REED RIDEN LLP
        155 Federal Street, Suite 1302
        Boston, Massachusetts 02110
        Tel (617) 500-8660
        Fax (617) 500-8665

## **VERIFICATION**

I, David Boyle, hereby verify and certify under 28 U.S.C. §1746 to the following

facts:

1. I am Vice President-Americas Sales for Commvault.

2. I have read the Verified Complaint. No single individual has personal

   knowledge of each and every fact contained therein. I have, however,

   reviewed the allegations therein. The allegations in this Verified Complaint

   are, based on my information and belief as informed by company documents

   and records and my own personal knowledge, true to the best of my

   knowledge, information, and belief.

I certify under penalty of perjury that the foregoing is true and correct.


Dated:__1/23/2022__

David Boyle

# EXHIBIT A

Data Management as a Service (DMaaS) | Multicloud IT                                    1/23/22, 2:48 PM



Partners    Threat Defense    Resources    Marketplace    Login    Contact Us     EN    🔍

Next-Gen Data Management    Products    Solutions    Support    Customers
Company

Free trial



OCT 5, 2021. 5 min read

# Data Management as a Service (D...
# Modern, Multicloud IT Environme...

*Distributed apps and data demand a modern approach t...*
*management*

Share this:        

Within today's IT environment, the cloud and its IaaS, PaaS and SaaS offerings are first among equals for adoption. And clearly, the debate about whether to move to the cloud is over. The number of enterprises counting on cloud is already over 90 percent, according to most analysts and company reports. And the number of enterprises pursuing a hybrid cloud strategy is somewhere between 62 percent (according to 451 Research) and 87 percent (according to Flexera).

Cloud business will be a $1 trillion market by 2024, says IDC. So now, it's simply a matter of what workloads belong in the cloud. Richard L. Villars, group vice president, Worldwide Research at IDC, says, "Cloud in all its permutations — hardware/ software/services/as-a-service as well as public/private/hybrid/ multi/edge — will play ever greater, and even dominant, roles across the IT industry for the foreseeable future.

## Data Management Challenges with Multicloud and Hybrid Cloud

So, as organizations take advantage of the many as a Service benefits, cloud adoption also introduces a new set of challenges for data management. For example, cloud adoption generates tremendous volumes of all types of new data. Moreover, managing and protecting this data typically requires a new set of point products, policies and protocols, skill sets and person-hours, and other demands of IT. The organization benefits from cloud, but the requirements for managing data across the IT environment significantly increase.

The challenge with today's data-centric workloads, the lifeblood of nearly every organization, is that there's too much data, in too many places, with too much cost, complexity, and risk. When you combine this with a lack of visibility, compliance, utilization, and the management overhead associated with all of it, this combination can really hold back business from its desired gains.



Douglas Ko

Product Marketing Director



This is precisely the conundrum that Data Management as a Service (DMaaS) solves. DMaaS is an umbrella term for organizations seeking easy access to multiple data management capabilities, such as backup and recovery, disaster recovery (DR), archiving, file and object services, dev/test provisioning, data governance, security, and analytics — all provided as a comprehensive, integrated set of offerings through a software-as-a-service (SaaS) model.

The right DMaaS solution fits into and helps you meet your multicloud and hybrid cloud objectives because it doesn't create new silos. Instead, the solution seamlessly manages data sources from both onsite and off-site sources and consolidates them in the cloud without requiring you and your people to change tools or user interfaces.

## A Modern Model

DMaaS is different from legacy data management approaches in a number of ways. First, to address a comprehensive set of use cases typically requires knitting together a series of silos. In a backup and recovery context, for example, you might encounter various software for different data sources, plus media servers, tape libraries, and target storage all put together in a patchworked solution to operate and manage. And that old-school model is time-consuming, error-prone, and costly.

Second, each part of the puzzle, whether it's backup, file and object shares, or disaster recovery, is owned and sold by a different vendor. And working with three, four, or five of those is just plain exhausting. Imagine having to put together a car by ordering all of the separate parts — complete with separate assembly instructions. And third, forget about seamlessly extending to the cloud. That usually requires an entirely different set of gateways.

A modern data management model eliminates data management complexity and unifies operations on a single platform. This implementation cuts out downtime and data loss. You can take advantage of streamlined operations — from backups to development and testing and analytics — while lowering total cost of ownership (TCO). And with DMaaS, you can manage data sources across data centers, the edge, and public clouds. Best of all, you can leverage all that data for business value.

With DMaaS, you drive agility by providing data management on-demand. You get to focus on policies and SLAs instead of infrastructure. Innovate faster by easily and quickly giving your developers and analysts access to data that can be tapped by advanced cloud services such as artificial intelligence and machine learning (AI/ML).

## Start With Backup as a Service (BaaS)

Backup is a great place to begin because it's a fundamental data management operation that has to be performed to ensure business continuity. BaaS simplifies data protection by unifying backup data across hybrid and multicloud with a single interface. It provides a secure and efficient way to protect and consolidate your backup data in one place, in the cloud. And what you want (and can do with BaaS) is to take it from the dark ages, where it's a mere insurance policy to the modern age of DMaaS where you can do more with your data to enable business and drive digital transformation.

Backup has always played the role of a great collector of data. Gather the critical bits and bytes that you want to first protect, but ultimately get the most value from. After you have your organization's data backed up and collected in the cloud, you can glean more

value from other DMaaS services like analytics, data governance, or development and testing features.

So in essence, you get to ditch your legacy backup for modern BaaS. The right solution supports backup and recovery of any workload running anywhere. You get everything from legacy on-premises applications to new cloud-native apps and SaaS or data at edge sites like remote offices.

The backup service runs directly on the multicloud data management platform while protecting data across hybrid cloud. This configuration delivers the true hybrid cloud experience, but without restrictive swim lanes (see Figure below).

## The Top Ten Use Cases for DMaaS

While BaaS is a great place to start, DMaaS will allow your organization to subscribe to discrete data management offerings addressing a wide range of use cases within a single DMaaS solution. Here's a quick list of the top ten:

- Offsite Backup and Recovery and BaaS

- SaaS and Cloud Apps Protection

- Long-Term Retention and Archiving

- Disaster Recovery

- Air-Gap Security and Ransomware Recovery

- Compliance and Data Governance

- Files and Objects

- Development and Test

- Cloud Data Lake

- Analytics

## And a Whole Lot More

This list is just the beginning–there's so much more information to share about DMaaS. That's why we've created the DMaaS For Dummies, Cohesity Special Edition. This comprehensive book is the ultimate reference guide, packed with helpful information including:

- How to align cloud and data strategies

- What are the business and technical benefits of a DMaaS model

- Which use cases and overall DMaaS approach is right for you

- How to get the most out of your data

Get your copy of Data Management as a Service For Dummies here.

backup and recovery          cloud          data management

data management as a service (DMaaS)          Data Protection

Disaster Recovery          multi-cloud

## You May Also Like

**BLOG**

3 Reasons to
Choose Backup as

**BLOG**

How To Manage
and Protect

**BLOG**

Delivering SaaS
and What It

Data Management as a Service (DMaaS) | Multicloud

7/23/22, 2:48 PM

a Service for you...

Cloud-Native...

Means to be...

**WHAT WE DO**

Overview

Solving Mass Data Fragmentation

**PRODUCTS**

Helios

DataProtect

SmartFiles

SiteContinuity

Marketplace

Certified Platforms

DataPlatform

**SOLUTIONS**

Solutions Overview

Backup and Recovery

File and Object

Disaster Recovery

Cloud

Ransomware Recovery

Dev/Test

Long-term Retention

**COMPANY**

About

Press

Events

Webinars

Team

Customers

Careers

Contact Us

Blogs

Developer

Security and Trust

We use cookies to provide you with the best experience on our website, to improve usability and performance and thereby improve what we offer to you. Our website may also use third-party cookies to display advertising that is more relevant to you. If you want to know more about how we use cookies, please see our Privacy Policy.

Cookies Settings

Accept Cookies

# EXHIBIT B

February 19, 2021

Brad SCHWARZ
████████████
████████████████████

Dear Brad,

On behalf of the management team and employees of Commvault Systems, Inc., it gives me great pleasure to extend the following offer of full-time employment to you as a Sr. Director, Metallic Americas Sales, reporting to David Boyle.

**Base Salary**

Your annual base salary will be $████████ per year, paid in accordance with the Company's standard payroll schedule.

**Target Incentive**

You will participate in the Sales Incentive Compensation Plan, which provides a cash bonus opportunity based on attainment of various objectives that will be detailed in the plan. Your personal annualized target bonus for each Fiscal Year will be $████████ based upon 100% attainment of objectives. Your actual bonus amount may be greater or lesser than the target amount based on actual level of attainment.

**Equity Grant Program**

As additional incentive for you to join Commvault and achieve certain milestones within your functional area which significantly contribute to the success of the Company, Commvault will grant to you Restricted Stock Units (RSUs) of Commvault Common Stock valued at approximately $████████. This grant becomes vested over a ████████ period at the rate of ████ per year. Additionally, the grant will be subject to the provisions of the Company's Long Term Incentive Plan and evidenced by a RSU agreement in customary form. More information will be provided upon employment.

**Start Date**

We anticipate your start date to be on or about 03/01/2021. This start date is contingent upon completion of a favorable background screen.

**Insurance Coverage and Other Benefits**

Commvault provides a comprehensive benefits package to all eligible employees. You will have the option to participate in various benefits immediately upon employment. You can view detailed benefit information on Your Benefits Resource at https://benefits.commvault.com. If you have questions, please contact benefits@commvault.com.

**Compliance Agreements, Background Screen & Immigration Reform & Control Act**

A condition of employment with Commvault is that you sign and abide by the Company's "Corporate Compliance Program

Agreement," which includes our Non-Compete/Non-Solicitation Agreement. The Compliance Agreement is attached for your review and signature. By accepting this offer, you also understand that you will be required, as an employee of Commvault, to agree (in writing) on your first day of employment and abide by Commvault's policies and practices which include but are not limited to the Anti-Discrimination and Anti-Harassment Policy, Equal Employment Opportunity Policy, Code of Business Ethics and Conduct Policy, Electronic Communications Policy and Equipment Return Agreement. If you would like to review these policies prior to accepting this offer, please contact your Recruiter.

The Immigration Reform and Control Act requires that Commvault, like all employers, verify the employment authorization of every employee hired in order to determine if the individual is legally authorized to work in the United States. The verification process requires that all new employees complete and sign an Employment Eligibility Verification Form certifying United States citizenship or authorization to work in the United States. It also requires Employers to examine specific documents that the employee must provide within three (3) days of the effective date of employment. You will be required to provide such documentation as part of your employment.

Please understand that the details contained in this offer are strictly confidential and should be regarded as such. Also, be aware that this offer of employment is not a contract and that your employment is "at will" and contingent upon a favorable background screen.

Please be advised, this offer is valid for a period of three (3) business days, after which time, unless we agree in writing to an extension, the offer letter will become null and void.

Brad, all of us at Commvault are truly excited about the opportunity to have you join us. We believe you will be a strong contributor to the growth and success of the Commvault team. Please accept our offer and confirm your start date by signing where indicated and return as soon as possible.

We look forward to working with you!

Sincerely,


Mary Beth Rupert
Director, Human Resources



# Annexure



# CORPORATE COMPLIANCE PROGRAM CERTIFICATION

In consideration of my employment with Commvault Systems, Inc., or one of its subsidiaries or affiliates, (hereinafter the "Company"), the undersigned hereby acknowledges and certifies that:

- I understand that the Agreements and Policies of the Corporate Compliance Program apply to my activities as an employee of the Company.
- I have read the Commvault Systems, Inc. Corporate Compliance Agreement (invention, confidentiality, non-competition, non-solicitation and ethics agreements) and I have had an opportunity to review and to ask questions about this Agreement.
- I understand as a Commvault employee, on my first day of employment, I will be required to agree to, in writing, and abide by Commvault's policies and practices which include but are not limited to Anti-Discrimination and Anti-Harassment Policy, Equal Employment Opportunity Policy, Code of Business Ethics and Conduct Policy, Electronic Communications Policy and Equipment Return Agreement. I understand my obligations under, and will agree to comply with, these Agreements and Policies.
- I agree to notify Human Resources immediately if I become aware of violations by other persons of any of these Agreements or Policies.
- Any knowledge I currently have of violations by other persons of the Commvault Systems, Inc. Corporate Compliance Agreement, Anti-Discrimination and Anti-Harassment Policy, or Equal Employment Opportunity Policy is set forth below.

# CORPORATE COMPLIANCE AGREEMENT

# EMPLOYEE INVENTION, CONFIDENTIALITY, NON-COMPETITION,

# NON-SOLICITATION AND ETHICS AGREEMENT

**THIS AGREEMENT** is made between me, the undersigned, and Commvault Systems, Inc. and on behalf of Commvault Systems, Inc., its affiliated companies as they exist from time to time, its duly authorized officers, agents, legal representatives, and assigns (hereafter referred to collectively as "Commvault"), and in consideration of my employment by Commvault and in consideration for the compensation to be paid to me in connection with this employment:

1. **DUTIES**. I shall render faithful and efficient services to Commvault and perform exclusively for Commvault such duties as may be designated by Commvault from time to time, which may include the functions of inventing, discovering and developing new and novel devices, methods, and principles relating to the business, research, and development of Commvault.

2. **WORK FOR HIRE.** All Inventions, notes, memorandum, deliverables, and other materials created in the course of my employment by Commvault, are the property of Commvault and shall be deemed a "work for hire" as defined in the Copyright Act. To the extent that title to any such works may not, by operation of law, vest in Commvault or such works may not be considered works made for hire, all right, title and interest therein are irrevocably assigned to Commvault in accordance with Section 4, below.

3. **DISCLOSURE OF INVENTIONS**. I shall promptly disclose to Commvault in writing all inventions (including, but not limited to, new contributions, concepts, ideas, developments, discoveries, processes, formulas, methods, compositions, techniques, technology, articles, machines, and improvements), all original works of authorship (to the extent not Work for Hire) and all related know-how (collectively the "Inventions"), whether or not patentable, copyrightable or protectable as trade secrets, conceived or made by me, alone or with others, during the period of my employment with Commvault and, in the case of clauses (b) and (c) below, during the period of my employment by Commvault and at any time after I cease to be employed by Commvault for whatever reason, which (a) relate in any manner to the actual or anticipated business, research, or development of Commvault, (b) are developed using equipment, supplies, facilities, trade secret or confidential information of Commvault, or (c) result from work performed by me or work supervised by me for Commvault.

4. **ASSIGNMENT OF INVENTIONS (the "Assignment")**.  I hereby presently and irrevocably assign to Commvault the entire right, title, and interest throughout the world in and to any intellectual property rights such as, but not limited to, trademarks, copyright rights, copyrightable subject matter, know-how, trade secrets, copyright registrations, reproduction rights, and waive any and all moral rights under 17 U.S.C. § 106A or otherwise.  Further, I hereby presently and irrevocably assign to Commvault the entire right, title, and interest throughout the world in and to the following (collectively, the "Assigned Patent Rights"):

(a)    the Inventions and any related patent application(s);

(b)    all provisional patent applications relating to the Inventions and patent application(s);

(c)    all patent applications claiming direct or indirect priority to the patent application(s) and/or any patents issuing from the patent application(s) that have been or may be filed or issued in the future, including divisions, continuations, and continuations-in-part;

(d)    all patents that may be granted on any of the foregoing in clauses (a) through (c);

(e)    all rights of priority under United States law and International Conventions relating to any of the foregoing in clauses (a) through (d);

(f)    all reissues, reexaminations, inter partes reviews, post-grant reviews, covered business method patent reviews, supplemental examinations,  renewals, substitutes, and extensions of any of the foregoing in clauses (a) through (e);

(g)    the right to file foreign and United States applications on the Invention(s), including filing directly in the name of Commvault; and

(h)    all past, present, and future: claims, causes of action, and enforcement rights for infringement or violation of any of the foregoing in clauses (a) through (f), including the right to sue and collect damages, royalties, and other remedies.

I hereby authorize and request the Commissioner of Patents of the United States, and any official of any country, whose duty it is to issue patents on applications, to issue all patents subject to this Assignment to Commvault. I represent that I have not previously assigned or licensed, or promised to assign or license, the Assigned Patent Rights to anyone other than Commvault, or taken any other action that conflicts with this Assignment or grants any immunities or rights under the Assigned Patent Rights to anyone other than Commvault. I acknowledge that I have been and/or shall have been fully compensated under the terms of the present Agreement and am not entitled to any future compensation or other remuneration for the Assigned Patent Rights. I

agree to communicate any facts known about the Invention(s) and promptly provide to Commvault any tangible property embodying or describing the Invention(s), which, if not presently in Commvault's possession, will be delivered to Commvault immediately upon creation thereof. I agree to sign all documents and do such additional acts as Commvault deems reasonably necessary or desirable to file, prosecute, perfect, defend, and enforce the Assigned Patent Rights, including:

(a) assisting in the preparation of and authorizing the filing of any other applications relating to the Assigned Patent Rights and any improvements made thereto by Assignor;

(b) executing and making all rightful oaths, declarations, and affirmations relating to the Assigned Patent Rights; and

(c) assisting (including by giving of testimony) in any litigation, interference, derivation, inter partes review, post-grant review, covered business method patent review, supplemental examination, ex parte reexamination, and any other pre-issuance or post-issuance proceedings in any jurisdiction relating to the Assigned Patent Rights.

I will not in the future make any commitments or do any act conflicting with or impairing the Assigned Patent Rights, including, without limitation, raising any controversy, contesting, or challenging, either directly or indirectly, the validity, enforceability, or alleged infringement of any Assigned Patent Rights or assisting any third party in doing so, serving as an expert, a witness, or as a consultant in any cause of action or for any third party that is adverse to the Assigned Patent Rights, or providing a written opinion, or any other written work product, in any cause of action or for any third party that is adverse to the Assigned Patent Rights. I acknowledge that there may be no adequate remedy at law for my breach of the terms set forth herein, and accordingly, I grant to Commvault in addition to the right to seek monetary damages, the right to have any such breach remedied by equitable relief including, but not limited to, a temporary restraining order, preliminary injunction, permanent injunction, and such other alternative relief as may be appropriate without the necessity of Commvault posting any bond or proving any damages.

My obligation to assist Commvault in obtaining, defending, and enforcing the Assigned Patent Rights shall continue beyond the termination of employment by Commvault for whatever reason, but Commvault shall compensate me at a reasonable rate after the termination of employment for time actually spent at Commvault's request providing such assistance. I hereby irrevocably designate and appoint Commvault as my duly authorized agent and attorney-in-fact to act for and in Assignor's behalf to execute and file any document and to do all other lawfully permitted acts to further the prosecution, defense, and enforcement of the Assigned Patent Rights with the same legal force and effect as if executed by Assignor.

No amendment to this Assignment shall be valid unless signed in writing by the party to be bound. No course of conduct or dealing by Commvault will act as an amendment, modification, or waiver of any provision of this Assignment.

This Assignment is enforceable by and inures to the benefit of Commvault and its successors and assigns.

5. **COMMVAULT CONFIDENTIAL INFORMATION**. Because of my employment by Commvault, I will have access to and will learn confidential and proprietary information and information which has not been made public concerning Commvault's business including but not limited to techniques, know-how, or other information of a confidential nature concerning Commvault's experimental and development work, trade secrets, procedures, business matters or affairs, including, but not limited to, information relating to inventions, disclosures, processes, systems, methods, formulas, patents, patent applications, machinery, materials, research activities and plans, grant proposals, costs of production, contract forms, prices, business plans, strategies, competitive strengths and weaknesses, volume of sales, promotional methods, and lists of names or classes of customers, as well as information of a confidential nature received from Commvault's customers, employees, joint venturers, collaborators, independent contractors and the like and information developed solely or jointly by me, included in connection with Inventions ("Commvault Confidential Information"). Information shall, for purposes of this Agreement, be considered to be confidential if not known by the trade generally, even though such information has been disclosed to one or more third parties pursuant to distribution agreements, joint research agreements, other agreements or collaborations entered into by Commvault.

6. **PROTECTION OF COMMVAULT CONFIDENTIAL INFORMATION**. I shall at all times use my best efforts and exercise utmost diligence to protect and guard Commvault Confidential Information. I will not use Commvault Confidential Information for personal gain or for any purpose outside of my employment by Commvault or disclose any such information to any person or entity either during or subsequent to my employment, without Commvault's prior written consent, except to such an extent as may be necessary in the ordinary course of performing my duties as an employee of Commvault; provided, however

that nothing in this Agreement is intended to prohibit me from reporting possible violations of federal law or regulation to any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of federal law or regulation and this Agreement should be interpreted consistent with this intent. Further, I hereby acknowledge that Commvault has informed me, in accordance with 18 U.S.C. § 1833(b), that I may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret where the disclosure (a) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. I also further represent and acknowledge that I have received, read, agree to, and will abide by all provisions, terms, and conditions of the Commvault Confidential Information Policy current as of this date, a copy of which is hereby incorporated by reference in its entirety in this Agreement.

7. **USE OF COMMVAULT CONFIDENTIAL INFORMATION**. I shall not, for my own account or as an officer, member, employee, consultant, representative, or advisor of another, during my employment with Commvault or at any time thereafter for any reason whatsoever, engage in or contribute my knowledge to engineering, development, manufacture, research, business analysis or sales relating to any product, equipment, process, or material that involve or relate to Commvault Confidential Information, without the written permission of Commvault. However, the foregoing provision shall not prohibit me from engaging in any work at any time after leaving the employ of Commvault, underlined provided, that Commvault Confidential Information is not involved in such work and I am not in violation of any other term of this Agreement or any other agreement entered into between me and Commvault. The provisions of this Section 7 shall not be construed as limiting to any extent my continuing obligations pursuant to the provisions in Section 6.

8. **IMPROPER USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION**.  I shall not, during my employment with Commvault, or at any time thereafter, improperly use or disclose any proprietary information or trade secrets of any former or current employer or other person or entity and I will not possess or bring onto the premises of Commvault any such proprietary information without the prior written consent of such employer, person or entity.

9. **OTHER RESTRICTIONS ON EMPLOYEE**. I represent that there are no other agreements or requirements to assign any invention or discovery conceived or made by me, alone or with others, unless I have so indicated at the end of this Agreement.

10. **DISCLOSURE OF INVENTIONS**. I represent that I have listed and described in detail at the end of this Agreement all inventions, if any, patented and unpatented, which I conceived or made prior to my employment by Commvault. Any invention not so listed and described shall be presumed to have been made during my employment by Commvault.

11. **RETURN OF COMMVAULT COMPANY INFORMATION**. Upon termination of my employment with Commvault for any reason, I shall disclose and provide to Commvault all originals and all copies which are in my possession or under my control, of all notes, memoranda, records, reports, drawings, blueprints, codes, programs, software, manuals, materials and data of any nature which are the property of Commvault, and every item in my possession or under my control which contains any Commvault Confidential Information.

12. **USE OF COMPANY PROPERTY**.  In accordance with the current Electronic Communications Policy, a copy of which is hereby incorporated by reference in its entirety in this Agreement, I agree and acknowledge that I have no expectation of privacy for any use of email, voicemail or other Company-provided Technology Resources (as defined in the Electronic Communications Policy).

13. **NON-COMPETITION AND NON-SOLICITATION**. I acknowledge that because my knowledge of the Commvault Confidential Information and the personal contacts with the customers and employees of Commvault acquired by me during my employment, Commvault would be irreparably damaged should I, in any manner or form, enter into any form of competition with Commvault. I, therefore agree that at all times during my employment and for a period of twelve (12) months thereafter, I will not directly or indirectly, in any individual or representative capacity, carry on, engage or participate in any business that is in competition in any manner whatsoever with the business of Commvault (as defined in Section 15E, below) in any geographic region or area in which I performed services for Commvault and/or on or for any customer account for which I performed services for Commvault, except as expressly provided for in this Agreement, or as may hereafter be expressly agreed to in writing by

Commvault. Further, I agree to not directly or indirectly hire, seek to hire, or refer for other employment any current employee of Commvault nor will I, in any manner or capacity, directly or indirectly: divert or attempt to divert from Commvault, through any means whatsoever, any business or customers of Commvault, during the twelve (12) month period following my termination of employment.  The phrase "carry on, engage or participate in any business that is in competition in any manner whatsoever with the business of Commvault" shall include, but not be limited to, the doing by you or by any person, firm, corporation, association or other entity that directly or indirectly, through one or more intermediaries, is controlled by, or is under common control with, or controls you, of any of the following acts other than as related to your services to Commvault pursuant to your employment with Commvault: carrying on, engaging in or participating in any such business as a principal, for your own account or solely, or jointly with others as a partner (general or limited), joint venturer, shareholder or holder of any equity security of any other corporation or entity, or as a consultant, contractor, or subcontractor or agent of or for any person, firm, corporation, association, or other entity or through any agency or by any other means whatsoever; or utilizing for your own benefit, or making available to any person, firm, corporation, association or other entity, any confidential or proprietary proposals, financial statements, governmental filings, cost data, business plans or correspondence relating to such information, or other Commvault Confidential Information. I acknowledge and agree that, in light of the nature of the business of Commvault, the foregoing activity and time period restrictions are reasonable and properly required for the adequate protection of Commvault, and that, in the event any such activity or time period restriction is deemed to be unreasonable or unenforceable by a court of competent jurisdiction, then I agree to submit to the reduction of such activity or time period restriction to the extent necessary to enable the court to enforce such restrictions to the fullest extent permitted under applicable law. It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied by any jurisdiction where enforcement is sought.

14. <u>ETHICS</u>. I understand and agree at all times to: (a) follow the policies and guidelines of Commvault, as set forth by Commvault from time to time; (b) represent Commvault in a professional manner exhibiting appropriate behavior consistent with the highest ethical standards; (c) not publicly make any disparaging comment or statement (written or oral) about Commvault, including but not limited to disparaging emails, "blogs", websites, electronic message boards or similar media; (d) comply with all applicable federal, state, and local laws, ordinances, regulations and codes, including all Security and Exchange Commission laws and regulations; and, (e) to apply for national security or other governmental clearance, if requested by Commvault.

15. <u>GENERAL</u>

A. I understand and agree that the restrictions of this Agreement are limited only to those restrictions necessary for the adequate and legitimate protection of Commvault. Each paragraph and subparagraph of this document is separate from each other and constitutes a separate and distinctive covenant. In the event any limitation hereunder is deemed to be unreasonable by a court of competent jurisdiction, then I agree to submit to the reduction of such limitation as the court shall deem reasonable. In the event that I am in violation of any limitation herein, then the time limitation shall be extended for a period of time equal to the period of time during which such breach should occur.

B. I understand that nothing in this Agreement shall confer upon me any right to continue in the employ of Commvault for any definite period of time. I understand and acknowledge that nothing in this Agreement shall alter the "at-will" status of my employment with Commvault. I understand that the restrictions contained in this Agreement shall survive the termination of my employment with Commvault for any reason.

C. I certify that I have not entered into, and I agree to not enter into any agreement, either written or oral, in conflict with this Agreement.

D. I hereby authorize Commvault to notify others, including, without limitation, customers of Commvault and my future employers, of the terms of this Agreement and my responsibilities hereunder.

E. This Agreement shall be governed by the laws of the State of New Jersey, without regard to New Jersey choice of law principles, and adjudicated in the courts located in the State of New Jersey. Each paragraph and subparagraph shall be independent and separable from all other paragraphs and subparagraphs, and the invalidity of a paragraph and subparagraph shall not affect the enforceability of any of the other paragraphs and subparagraphs. For purposes of this Agreement, the "business of Commvault" shall include the business of any corporation, firm, or partnership, directly or indirectly, controlled by, controlling, or under common control with Commvault or any partner or joint venturer of Commvault. For any violation of this Agreement, a restraining order and/or an injunction may be issued against me in addition to any other rights Commvault may

have under applicable law. In the event any party to this Agreement is successful in any suit or proceeding brought or instituted with respect to this Agreement or to enforce the Agreement, the prevailing party will be paid by the losing party, in addition to other costs and damages, reasonable attorney's fees and costs.

F. This Agreement shall be effective during the period of my employment by Commvault and for any periods thereafter as set forth herein, inure to the benefit of any successor or assignee of Commvault, and be binding upon my heirs, administrators, and representatives.

I acknowledge that I am entering into this Agreement knowingly and voluntarily, and that I have had an opportunity to review it with counsel of my choosing.

**Signature:** *Brad  Schwarz*
Brad Schwarz (Feb 19, 2021 12:06 PST)

**Email:** ██████████████

# EXHIBIT C

**From:** **Brad Schwarz** bschwarz@commvault.com 📎
**Subject:** Resignation
**Date:** January 19, 2022 at 8:20 AM
**To:** Thad Keating tkeating@commvault.com, David Boyle dboyle@commvault.com, Manoj Nair manojnair@commvault.com
**Cc:** Mary Beth Rupert mrupert@commvault.com

BS

Thad, David, and Manoj:

In what has been the most difficult and conflicted business decision of my career, I have found myself unable to dismiss the opportunity presented to me by Cohesity. I've tried. As a result, I must formally submit my resignation.

Upon agreeing with you to continue forward here, my confirmation to Kevin of the same unexpectedly turned a personal visit of thanks into an extended evening with Mohit, their CFO, their head of Americas Sales, and other team members. After yet more conversation about what they want to solve, and the role they want me to play in that transformation, I am left believing the position and compensation are too good a fit to refuse. With no solicitation, Kevin presented me an updated comp package that I would be foolish not to take.

None of this was prompted by a bid-up to your goodwill to help bridge my brewing concerns, for which I am very grateful. I did not anticipate what they would do.

Bottom line. The proposed position affords me the ability to work very closely in shaping Cohesity's DMaaS go forward, with compensation that allows me to accelerate my opportunities for subsequent adventures beyond work. Perhaps knowing me as you do, you'll now take some certain confidence in Metallic's proven direction :)

I've never chosen to leave a team I respect and genuinely *like* more than what we have built here at Commvault and Metallic. I take a good measure of pride in the positive comments I've received more recently about the efficacy of the team we have jointly evolved. Metallic's success will be next to impossible to replicate, given your collective leadership and the unique power, culture, and momentum of the business. I will take comfort in knowing that as one of the two acknowledged leaders in the space, there will be adequate room for us to operate independently in a market large enough where both companies will be very successful.

I hope you can understand, appreciate and respect the nature of the position and opportunity and why I'm doing this, with good wishes for me to do well and minimal bitterness that it's a move to a competitor.

As the situation snowballed from my attempts to extract myself last Wednesday and Thursday, I've kept at some arm's length in QBR's etc. to respect the business here and minimize conflicts. Friday's momentum demanded I work yesterday to see that several significant deals for Metallic would remain on track and get prioritized through proposal and contract steps, including ████████████

Manoj and Thad - ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████

The notion of parting with this team at this time sits very heavy with me. It's 4:30 am, and I've been up for an hour, knowing I need to pull the plug. I appreciate the grace and goodwill you have shown me through the past year, which has been difficult personally with Rachael. I'm going to miss each of you very much. And can't say things more plainly than this. "Thank You."

I would be happy to share feedback and other insights from the Metallic specialty team as we have been marching down the ████ road. ████████████████████████████████████████████████
████████████████████████████████████████

████ has been itching to walk through the numbers on the forecast call this morning. He knows the drill. ████████████████
████████████████████████

Warmest Regards,

Brad

**Brad Schwarz**
AVP, Metallic Americas Sales
**m:** ████████████
**e:** bschwarz@commvault.com
**w:** metallic.io



A Commvault Venture

    

# EXHIBIT D



**From:** Brad Schwarz <████████@gmail.com>
**Sent:** Thursday, January 20, 2022 3:11 PM
**To:** Brad Schwarz <████████@gmail.com>
**Subject:** About Yesterday

External email. Inspect before opening.

I wanted to send a note immediately to help explain the news, but more importantly, I wanted to respect Thad and Manoj's request that there be time for them to share it first. Very candidly, so that you know directly, my decision to move out of Commvault has been the most challenging personal / business decision I've had to make in my career. I've received so many supportive correspondence and texts and otherwise from everyone, it's humbling. Thank You. I can't express how much that means to me. So as to put all this behind, and focus to the future, some explanation if you care to know...

First, I was never looking to make a move. A competitor pursued me. I've greatly enjoyed being a part of what we've been building together, where the best part of this has been the blend of exceptional professionals who never lose being people-first in the mix of a tough job. Second, even this morning, the thought of leaving the team remains tough. Third, I turned down the opportunity twice before agreeing. Agonizing, not going to lie. In that process, I was conflicted, and not the best behaved. The fundamental reason for all of this is how much I appreciate this team, bottom line.

Yet. I made a choice, and I had to. I've been in the business longer than I care to want to confess. When presented ultimately with the role, responsibility, mission, and compensation, and weighing that against my time horizon for wanting to do other things in my life besides work, I concluded very simply that I would be an idiot to refuse to take advantage of what has been presented to me. I can handle being called many things. But I try to not be an idiot.

Here's what (I think) ultimately matters the most about the situation:

- The desire of the other company to bring me over speaks much less about me than the fact that SaaS

Data Protection and Management is a rocketship. The "other company" recognizes that the team and company who has done the best in SaaS protection is Metallic and Commvault. So to extrapolate, in a way, this is all your fault :) More seriously, the relevance here is that we are in the midst of an industry shift that is driving a seismic migration of workloads to off-prem from on-prem. It is happening every day. As you're seeing, there are people in the middle of on-prem choices that are literally being told to stop, to shift, to go to the cloud. Supply chain and hardware scarcity is in large part driving that.  Business waits for no one, no one thing, and business leaders will flex to accomplish the mission using whatever technology delivers the most expedient and safe outcome. Metallic has been the answer to that, and the broader Commvault team is in the catbird seat *in part due to the support* provided by the Metallic team and its leadership. You are humming together as a unit to execute effectively. You are the best in the business doing it. You will be wildly successful doing it. You have the **absolute best** in sales leadership across all markets to ensure you get there, and my incremental add or replace can be handled easily by several people at the company.

- The strategy, supporting organizations, and technology platform that fuels Metallic is ahead of the closest competitor. The progress Metallic has made in the breadth of offering, security engagement, CTO caliber customer conversations, legal accommodation, and customer success team growth and the process has been vital in helping the business scale. In this quarters' drive to a ▮▮▮▮quarter, Metallic and Commvault will achieve escape velocity for customer acquisition. Right Strategy, Right Product, Right Vision, SUPERB Team. ▮▮▮▮▮▮▮▮▮▮▮▮ as we've discussed. The sky is the limit.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
The sky is the limit.

- For my sense of professional satisfaction, position, and financial goals, I'm going to be aligned at a level where I can execute what I believe will be effective for the market, to help do this again. This with a span of control, both organizationally and with geographic responsibility, that is fulfilling for me at this point in my career. I hope to make a difference in those regards. I want to accommodate things a certain way that is different than Commvault and leave a mark doing it. Different is not wrong. It's just different.

People get worried and uptight about competition. It's natural. It's humorous to me. Yet it's a foundational aspect of being human, and of capitalism and what's made this country better than great. Even in 2022. We're fine when it's Football, and members of the same house can respect and love each other even though we favor different teams. I think we can appreciate that here. The simple reality in our business is that we serve a near-infinite market. **Everyone needs badass, fabulous plumbing.** If you don't have great plumbing, things get stinky. Everyone having the same plumbing is boring. There is nothing to admire or brad about from house to house. Two players in the market have the fundamentals that matter, and we (now) work for those companies collectively. Rubrik can't scale. **There are plenty of spoils to go around**. Think how well we do at Commvault where factually ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. It's crazy and it's fantastic, And it will only become more so. There should be great collective joy in kicking the tar out of incumbents (no matter who) who don't deserve to be in the market anymore because all they do is milk a maintenance stream (greed) and don't innovate to solve real customer problems.

Everyone will make considerable sums of money. I'm not as bright as Thad. I'm certainly not as intelligent & wise or adept as Manoj or David. So I have much work to do the old-fashioned blue-collar way, and I'm going to do it. Those who know me know that when I can't finesse something, I just bang my head. One way or the other, we'll get there. I sincerely hope and pray I can see you guys always at a bar, restaurant, an event, and even

walking in and out of customer buildings (if that's ever a thing again), knowing that you have my most tremendous respect and gratitude.

I know you're going to kill it. ███████████████████████████████████████████████
████ ███████████████████████████████ Just be nice to the old guy when you're kicking the tar out of me. Do remember that the Bull on the Hill jokes aren't just fiction :)

Warmest Regards, and All My Respect,

My Email: ███████████████
My LinkedIn will update Monday
My Cell Phone: ███████████